## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| MARIO RASHAD SWAIN, | § | |
| Petitioner, | § | |
| vs. | | No. 6:06cv425 |
| | § | |
| RICK THALER, Director, | | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | | |
| | § | |
| Respondent. | | |

## MEMORANDUM OPINION

Mario Rashad Swain ("Swain"), an inmate confined to the Texas Department of Criminal Justice, Institutional Division, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. §§ 2241 and 2254. Swain challenges his capital murder conviction and death sentence imposed by the 219th Judicial District Court of Brazos County, Texas in cause No. 27,037, styled *Texas v. Mario Rashad Swain*. Having reviewed the submissions of the parties, the state court record, and the applicable law, the Court finds the petition to be without merit.

### I.    *Facts*

The underlying facts of this case are correctly summarized by the Texas Court of Criminal Appeals ("TCCA") in its published opinion on direct appeal. *Swain v. State*, 181 S.W.3d 359 (Tex. Crim. App. 2005).[1]

Lola Nixon, the victim, lived in a house on Iris Circle in Longview, Texas. Nixon made

---

[1] The Court will add to the TCCA's account the background facts and procedural history that are pertinent to this Court's disposition of Swain's federal *habeas* petition.

plans to have dinner with friends on the evening of December 27, 2002, but never arrived at the restaurant. Neighbor Ashley Dulweber noticed a truck parked outside a vacant house on their street at around 9:00 p.m. that evening and reported it to police. A police officer who was dispatched to Iris Circle noted the license number of the truck and left about forty minutes later, after seeing no unusual activity.

Nixon's friends contacted the police when they were unable to locate her on December 28. When the police arrived at Nixon's house, Nixon was gone and there was evidence of forced entry and blood throughout the house. The police checked the license plate number of the truck that had been parked on Iris Circle the previous night. They contacted the registered owner, who told him that his grandson, Swain, had possession of the truck. Swain was not home when the police first attempted to contact him at his residence, but he called Detective Terry Davis about thirty minutes later. Davis told Swain that he wanted to talk to him, and Swain gave him the address of the residential treatment home where he was working as an after-hours house sitter.

Davis and Detective Jim Nelson went to Swain's place of employment that evening and asked him why his truck had been on the victim's street the night before. He first stated that he parked the truck on Iris Circle while he was riding around with a friend. Davis responded that he did not believe him, and then Swain changed his story. He stated that he and a man named Casey Porter broke into a house on that street, that Porter beat the female homeowner who arrived home in the middle of the burglary, and that they placed her in the trunk of her black BMW, drove her to a remote location in southern Gregg County near the airport, and left her there alive. Swain then signed a consent form authorizing a search of his truck and agreed to show the detectives where he and

Porter had left the victim. They got into Davis's car, where Davis read Swain his *Miranda* warnings.[2] Swain then directed the detectives to an area off Highway 349 near the airport. Nixon was not there, but they found blood on the grass, a black trash bag, and a piece of a tire jack on the ground.

Davis took Swain to the Longview Police Department, where he again read Swain his *Miranda* warnings and took his first written statement shortly after midnight. Swain stated that Porter beat a woman when they were burglarizing her home and that they left her at a secluded area "near Jerry Lucy Road and Farm to Market 349." Davis obtained a warrant to arrest Swain for burglary of a habitation around 3:00 or 4:00 a.m. Police also arrested and questioned Porter, but released him when they verified his alibi.

At 6:30 a.m. on December 29, Davis read Swain his warnings and took his second written statement, in which he said that Brian Mason Woods beat a woman while they were burglarizing her home and that "she was alive when [they] left her off Highway 349." The police then contacted Woods and excluded him as a suspect after confirming his alibi. Woods testified that Swain came to his house on the morning of December 28, told him that he had robbed a woman, and gave him some jewelry that he took during the robbery. Swain also used credit cards that he took during the robbery to withdraw cash and fill Woods's car with gas.

Swain was charged with burglary of a habitation and was taken before a magistrate for his statutory warnings at 10:30 a.m., at which time he requested the appointment of counsel. He was then taken to the Gregg County District Attorney's Office, where he was questioned by Detective Monty Gage and Mike Augustine, an investigator with the District Attorney's Office. He left the office with Gage and Augustine and directed them to Nixon's body, which was located in an

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

abandoned vehicle within a mile of where [Swain] first led police. Nixon had been beaten over the head and stabbed in the chest. The medical examiner testified that "[t]he cause of death was homicidal violence, including sharp force injuries, blunt force injuries, and probable strangulation."

Swain was taken back to the Longview Police Department, where Davis again read him his rights and took his third written statement at 1:00 p.m. In this statement, he admitted that he alone burglarized the victim's home, hit her in the head with a tire tool, attempted to clean her up in the bathroom, and placed her in the trunk of her black BMW. He drove her to a secluded area and placed her in an abandoned car, believing that she was still alive when he left. He then returned to the victim's house, attempted to clean up the scene, and left on foot. He later disposed of the tire tool in a dumpster at a CiCi's Pizza restaurant, used the victim's credit cards for gas and money, and gave Woods some jewelry. Police found the tire tool in a dumpster located across the parking lot from Cici's Pizza. Police also searched [Swain's] truck and found black jeans, tennis shoes, and batting gloves stained with Nixon's blood, as well as keys to Nixon's car and her garage door opener.

## II.     *Procedural History*

Swain was indicted for capital murder on March 13, 2003, and arraigned on March 28, 2003. Swain pleaded not guilty. His trial began on November 17, 2003. On November 20, 2003, after being found guilty at a jury trial, he was sentenced to death. His conviction and sentence were affirmed by the TCCA, *Swain v. State*, 181 S.W.3d 359 ( Tex. Crim. App. 2005), and his petition for state post-conviction relief was denied. *Ex parte Swain*, No. 64,437-01 (Tex. Crim. App. Sept. 20, 2006). On August 31, 2007, he filed this petition for a writ of *habeas corpus* in this Court.

## III.     *Claims Presented*

Swain's petition raises three claims:

A.    The police deliberately waited until after he confessed to inform him that he had the right to remain silent and the right to the assistance of counsel, in violation of his rights under the Fifth and Fourteenth amendments.

B.    His counsel rendered ineffective assistance:

    (1)    by failing to preserve his "question first" claim for appeal;

    (2)    by failing to investigate his background and failing to present mitigating evidence at the punishment determination phase of his trial.

C.    The prosecution's shuffling of the jury panel violated his right to the equal protection of the law.

## IV.   *Standard of review*

Because Swain's application for *habeas corpus* was filed after 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to his claims. Under the AEDPA, "a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must first present those claims to the state court and thereby exhaust state remedies." *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001) (citing 28 U.S.C. § 2254(d)), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002). If the last state court to consider the claims expressly based its denial of relief on independent and adequate state procedural grounds, the petitioner's claims are considered to have been defaulted, and federal *habeas* review is barred unless the petitioner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law or shows that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

If a state court denies a petitioner's claims on the merits, a federal court may grant *habeas* relief only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The court reviews questions of law and mixed questions of law and fact under the first part of this standard, while it reviews questions of fact under the second part. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S. 949, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001). Furthermore, the state court's findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption through clear and convincing evidence. *Richardson v. Quarterman*, 537 F.3d 466, 473 (5th Cir.2008), *cert. denied*, 129 S.Ct. 1355, 164 L.Ed.2d 589 (2009).

If the state court based its denial of relief on both procedural and substantive grounds, in the absence of good cause and prejudice or a fundamental miscarriage of justice, a reviewing federal district court must deny relief due to the procedural default. *Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006). This rule, however, is not absolute. A court may look past the question of procedural default if claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004).

**V.**    ***Analysis***

   *A.    Failure to Exclude Inculpatory Statements Obtained By "Question First" Tactic*

   Swain's first claim is that the law officers in this case deliberately waited until after he confessed to inform him that he had the right to remain silent and the right to the assistance of counsel, in violation of his rights under the Fifth and Fourteenth Amendments. After informing him of his rights, the officers retook his statement. This practice, known as "question first," has been

prohibited by the Supreme Court of the United States. *See Missouri v. Seibert*, 542 U.S. 600, 605–611 (2004).

The state court found this claim to be procedurally barred because it had not been properly preserved for review and also denied the claim on its merits. Given that the Court opts to address this claim on the merits rather than resolve it on procedural grounds, the issue to be decided is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). The underlying factual findings supporting the state court's ultimate conclusion are entitled to deference. *Miller v. Fenton*, 474 U.S. 104, 112 (1985).

Under the long-standing precedent of *Miranda v. Arizona*, 384 U.S. 436 (1966), a defendant's statements are generally not admissible if made before he is advised of his rights. *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006). *Miranda* warnings were established by the Supreme Court to safeguard a suspect's privilege against self-incrimination during a custodial interrogation. *Miranda*, 384 U.S. at 436, 474 (1966). The procedures are not "themselves rights protected by the constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974); *See also United States v. Smith*, 7 F.3d 1164, 1170 (5th Cir. 1993).

A *Miranda* violation may also taint later statements by the defendant, even if officers give the required warning prior to the defendant's statements. *Missouri v. Seibert*, 542 U.S. 600, 618 (2004) (Kennedy, J.)(concurring opinion). As the plurality pointed out in *Missouri v. Seibert*, "[I]t would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Seibert*, 542 U.S. at 611 (Souter, J.). However, this rule does not apply

in the absence of an initial *Miranda* violation. *Courtney*, 463 F.3d at 336 ("*Seibert* only applies if the first statements were obtained in violation of *Miranda*.").

Petitioner argues that his statements were improperly admitted in violation of *Seibert* because he was not given his *Miranda* warnings until after he had already made incriminating statements. But Swain's claim does not withstand scrutiny because the officers did not violate *Miranda* when they initially questioned him.

*Miranda* only applies to custodial interrogations. *Courtney*, 463 F.3d at 336. The record demonstrates that Swain's first inculpatory statement was made prior to his being taken into custody. Furthermore, the state court found that the initial statement was made before Swain was in custody, and the petitioner has not rebutted this factual finding with clear and convincing evidence. *See Richardson v. Quarterman*, 537 F.3d 466, 473 (5th Cir. 2008)("A state court's findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Detectives Davis and Nelson testified at trial regarding the interrogation and arrest of Swain. After discovering that the truck found parked in the driveway of an abandoned residence near the victim's home belonged to Swain, the detectives went to Swain's place of employment to question him. When questioned about why his truck had been seen on Iris Circle the night the victim disappeared, Swain initially responded that he had parked his truck there while he went riding around with a friend. Davis testified that he told Swain that he did not believe his story and explained to Swain that this was his opportunity to come clean if Swain was "caught up in the middle" of "something bad." Swain then gave the detective his first oral admission implicating himself in Lola's disappearance. Davis testified that Swain was not in custody at the time he made this statement.

At this point, Detective Davis obtained Swain's consent to search the truck. The consent-to-search form was introduced during trial as State's Exhibit 8. Davis made a quick search of the truck, then turned his attention to finding the victim. Davis testified that because Swain had told him that Lola was alive when they dumped her body, locating her was their top priority.

Swain told the officers that he could take them to where he and his friend had dropped her off. Swain was then placed into the back seat of Davis's car, and they drove to the airport in an attempt to locate the victim. During the hearing on Swain's motion to suppress, Davis testified that Swain was "detained" at the point he was placed in Davis's vehicle. Swain was not free to leave at that time and was read his Miranda warnings. Swain later made three written statements to police, ultimately confessing that he was the sole perpetrator of the burglary and murder.

Nelson stated that he handcuffed Swain in the garage and told him they were "going to detain him for further investigation." Nelson explained, "He was moving around quite a bit, walking around the garage. I didn't know if he was going to — if he was just nervous or he was going to attempt to flee on us, so I handcuffed him." Davis testified, however, that he did not recall Swain ever being handcuffed while he was with him.

In considering the apparent conflict between Detective Davis and Nelson, the Court of Criminal Appeals concluded that, when viewed in the light most favorable to the trial court's ruling, the evidence "supports a finding that the arrest did not take place until after [Swain] admitted his involvement in the burglary." Swain, 181 S.W.3d 366.

Because Swain was not in custody, *Miranda* warnings were not required. Therefore, Swain's subsequent post-warning statements were admissible.

Moreover, assuming *arguendo* that Swain's initial statements were custodial, the post-

warning statements were still admissible. Absent deliberately coercive or improper tactics in obtaining the initial statement — in other words, the officers intended to engage in the proscribed "question first" tactic — the only question is whether the subsequent statements were voluntary. *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *Seibert*, 542 U.S. at 622; *Courtney*, 463 F.3d at 338. *See also*, *United States v. Nunez-Sanchez*, 478 F.3d 663, 668–69 (5th Cir. 2007)(recognizing the continued application of *Elstad*). The court considers the totality of the circumstances. *Elstad*, 470 U.S. at 318.

A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but un-warned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights. *Oregon v. Elstad*, 470 U.S. 298 (1985). *See also*, *United States v. Mendez*, 27 F.3d 126, 131 (5th Cir. 1994).

Only if the officers intended to circumvent *Miranda* by engaging in a deliberate, two-step, "question first" practice does *Seibert* standard asserted by petitioner apply. *Courtney*, 463 F.3d at 338–39 (adopting Justice Kennedy's concurring opinion in *Missouri v. Seibert*, 542 U.S. 600). Under *Seibert*, subsequent statements are not admissible unless measures were taken to counteract the effect of the initial improper interrogation. *Seibert*, 542 U.S. at 622.

However, the facts of *Seibert* are distinguishable. Unlike Swain, *Seibert* dealt with a police protocol for custodial interrogation that called for intentionally giving no warnings of the rights to silence and counsel until interrogation had produced a confession, then following the confession with *Miranda* warnings and leading the suspect to cover the same ground a second time. *Seibert*, 542 U.S. at 609–10. Also, unlike the informal questioning of Swain, Seibert was arrested five days after the

offense, taken to police headquarters, and interrogated for approximately forty minutes prior to being given her *Miranda* warnings. *Id.* at 604–05. Swain was questioned informally outside his place of employment during the officer's early investigation. As soon as Swain made incriminating statements, his rights were read to him. His rights were provided to him in many different ways in the hours that followed. The officers' actions were not a ruse to obtain a custodial admission before application of the required constitutional warnings. Swain's situation has nothing in common with *Seibert*.

Petitioner does not independently challenge that his subsequent post-warning statements were voluntary. Because the *Seibert* rule does not apply and Petitioner's subsequent statements were voluntarily made after Swain was given his *Miranda* warnings, the statements were properly admitted. Accordingly, the state court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

### B.    *Ineffective Assistance of Counsel*

Swain' second claim is that his trial counsel rendered ineffective assistance in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. Because this claim was denied on the merits by the state court, the issue for this Court is whether the state court's decision was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), established the legal principles that govern claims of ineffective assistance of counsel. The *Strickland* test has two prongs: a performance and a prejudice prong. First, the petitioner must show that his attorney's

performance was so deficient that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. To establish this, the petitioner must show that counsel's performance fell below an objective standard of reasonableness established by prevailing professional norms. *See Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland*, 466 U.S. at 687). In analyzing this prong, the reviewing court must begin with a presumption in favor of the attorney and must determine whether the strategy chosen by counsel was within the range of available, professional, reasonable judgments, giving the attorney room to make "tactical decisions." *Id.* at 690–91. Therefore, if trial counsel can show that his decision was a tactical one that was among available choices at the time, counsel's performance will be presumed to be reasonable. *Id.*

Second, the petitioner must also prove that the outcome of the case was due to the attorney's performance at trial, thereby rendering the outcome so unfair that the outcome is unreliable. *Strickland*, 468 U.S. at 687. Further, in *Lockhart v. Fretwell*, the Court refined the *Strickland* prejudice prong, holding that the inquiry should not focus singularly on whether the outcome would have been different without the performance of counsel, but rather on whether the attorney's performance made the proceeding fundamentally unfair or unreliable. 506 U.S. 364, 372 (1993). Simply making a showing that counsel's actions could have had an effect on the outcome of the trial or that the errors made by counsel might have been detrimental to the defense's case is insufficient to show that the outcome of the case was prejudiced. *Id.* The petitioner must show that but for counsel's actions, the result of the proceeding would have been different. *See Wiggins*, 539 U.S. at 521(citing *Strickland*, 466 U.S. at 687). Deficient performance requires proof that counsel's representation fell below the objective standard of reasonableness established by prevailing professional norms. *See Id.* at 534, 123 S.Ct. 2527.

A petitioner must prove both prongs of the *Strickland* test. Thus, a reviewing court need not address both prongs of the test if proof is lacking either one. *See*, *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009)("If the petitioner fails to prove the prejudice component, the court need not address the question of counsel's performance.")(quoting *Strickland*, 466 U.S. at 697).

### 1. Failure to preserve "Question First" Claim

Swain makes two separate arguments or sub-claims as to why his trial counsel was ineffective. Swain first argues that his counsel rendered ineffective assistance by failing to properly preserve his *Seibert* claim for appeal. But this Court has rejected the merits of Swain's *Seibert* claim. Thus, Swain cannot establish that there is a reasonable probability that counsel's objections would have been sustained, or if denied, that his death sentence would have been reversed on appeal. Stated another way, the attorney's failure to preserve the *Seibert* claim, a claim that was not valid under these facts, was not ineffective performance and cannot have prejudiced Swain. Because Swain cannot establish either prong under the *Strickland* test, the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

### 2. Failure to Investigate Mitigating Evidence

In his second sub-claim, Swain contends that his trial counsel failed to perform a proper investigation and, thus, did not offer any mitigation evidence in the punishment determination phase of his trial. Specifically, Petitioner complains that counsel made no investigation of mitigating evidence beyond his immediate family who testified at the punishment phase of the trial that there were aspects of Petitioner's character that were worth saving. The state court held that counsel's failure to offer evidence of Petitioner's difficult upbringing and possible mental health issues was

not unreasonable, as it was based upon reasonable professional judgment after competent investigation.

The Court will assume *arguendo* that Swain can demonstrate deficient performance and will focus on the prejudice prong of the *Strickland* test. *See Day v. Quarterman*, 566 F.3d at 536. As noted, to obtain relief in a *habeas corpus* proceeding, a petitioner must also establish that the state court's finding of no prejudice was unreasonable. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*), *cert. denied*, 537 U.S. 1104 (2003). To analyze this issue, the Court compares the evidence actually presented at Swain's sentencing with any additional evidence presented in his state post-conviction proceeding. After considering all of the evidence, the court must decide whether the additional evidence was so compelling that it was unreasonable for the state court to determine that there was not a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death was not an appropriate sentence. *See Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003), *cert. denied*, 543 U.S. 835 (2004).

### a. Punishment Phase Evidence

At the punishment phase of Swain's capital murder trial, the state presented evidence that in January 2001 he assaulted a fourteen-year-old girl named Olivia Torres, and in December 2002 he burglarized the home of a woman named Nicole Anderson, and rendered her unconscious by making her inhale halothane, a general anesthetic. One of Swain's girlfriends, Ashley Russell, testified that Swain spoke to her about knocking out older women at car washes and taking their money, and showed her a bottle of halothane. She also saw a book which Swain kept containing driver's license numbers, car models, and descriptions of women driving the cars.

Crystal Hargett testified that Swain asked her on more than one occasion to help him rob

victims. Teresa McNene testified that someone struck her in the back of the head in October 2002 and tried to steal her purse. A month later, someone burglarized her work area, stealing her cosmetologist license and her cordless phone. Another of Swain's girlfriends, Kristie Anderson,[3] testified that Swain brought a cordless phone to his apartment. Anderson gave the phone to Officer Monty Gage, who testified that the serial number on the phone matched the serial number of McNene's phone. Kristie Anderson also testified that she found papers at Swain's apartment with the victim's name and other names, both male and female, addresses, vehicle descriptions, and license plate numbers, written in Swain's handwriting. Betty McDonald testified that in 1999 she was attacked from the back seat of her car by a man with a taser. Officer Gregory Stewart testified that fingerprints taken from McDonald's car after the incident were Swain's.

The Defense called five witnesses: Swain's mother, his maternal grandfather and grandmother, one of his jailers, and a criminologist. Swain's Mother, Mechelle Todd, testified that after he was born the family moved between Long Beach, California, Longview, Texas, and Houston, Texas. She divorced Swain's father when Swain was five years old and married his stepfather three years later. She testified that Swain got along well with his stepfather. When he was twelve years old, Swain moved from his residence in California back to Longview, Texas and lived with his grandparents for about four or five years. He then moved back to California, but did not like it and returned to Longview. Both grandparents testified that Swain caused them no trouble, was quiet, obedient and respectful, and attended church regularly. All three testified that there was good in Swain and that Swain had a good side which was worth saving. On cross-examination, Swain's grandfather and his mother admitted that they were aware that Swain and another youth were

---

[3]The record reflects that Kristie Anderson is unrelated to Nicole Anderson.

involved in an incident of sexual cruelty involving a cow belonging to Swain's uncle, and his grandfather had to pay the veterinarian bill. Swain's jailer testified that Swain had not assaulted anyone during the year he had been incarcerated and had not caused trouble other than minor infractions, such as being in the wrong part of the jail at head count time. The criminologist testified to security procedures in the Texas prison system.

During his state post-conviction proceedings, Swain presented a comprehensive social history report from Sheri Stillwell, and a mitgation affidavit from Dr. Kate Allen. Both are Licensed Clinical Social Workers, and both opined that Swain suffered from post-traumatic stress disorder as a result of (1) seeing his father beat his mother, and (2) being locked in a closet while his father beat his mother, when Swain was a young child. Swain also suffered from attachment issues as a result of frequent moving and having to share his mother with his stepfather and stepbrother. Finally, he was sexually abuse when he was six years old by being encouraged to watch pornographic movies by his sixteen-year-old uncle, and he himself began having sexual intercourse at age twelve. Swain's psychological problems appeared serious enough to his mother that she took him to see a psychologist when he was ten or eleven, but the psychologist told her that nothing was wrong with him. He began engaging in criminal activity (shoplifting) when he was twelve years old.

b.    *Comparisons with Other Cases*

That Swain suffered emotional traumas that were not his fault would likely engender sympathy in the minds of reasonable jurors. Unfortunately, difficult upbringings are not uncommon in our society, and the state court found that even had this evidence been presented to the jury, there was not a reasonable probability that at least one juror would have voted to spare Swain's life. To determine whether Swain's mitigating evidence is compelling, the Court will compare it with

evidence that has been successful, and unsuccessful, in other cases.

In *Wiggins*, the Supreme Court found compelling that the petitioner's mother, a chronic alcoholic, left him and his sibling home alone for days at a time, forcing them to beg for food and eat paint chips and garbage. She beat the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced Wiggins's hand against a hot stove burner — an incident which led to his hospitalization. At the age of six, Wiggins was placed in foster care. His first and second foster mothers abused him physically, and his second foster father sexually molested and raped him. At age sixteen, Wiggins ran away from his foster home and began living on the streets. He returned intermittently to foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by a supervisor. He was borderline mentally retarded. *Wiggins*, 539 U.S. at 516–518.

In *Williams v. Taylor*, the Supreme Court reached a similar result on similar facts, based upon a juvenile record stating that:

> [Williams' home was] a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bathrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash . . . . The children were all dirty and none of them had on underpants. [Williams' mother and father] were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them . . . The children had to be put in Winslow hospital, as four of them, by that time, were definitely under the influence of whiskey.
> 529 U.S. 362, 395–96 (2000).

Williams' parents were sent to prison for the criminal neglect of Williams and his siblings. Williams had also been severely and repeatedly beaten by his father, and he was sexually abused during one stay in a foster home. He was also borderline mentally retarded.

In *Rompilla v. Beard*, 545 U.S. 374, 391–393 (2005), the Supreme Court again reached a similar result on similar facts, finding compelling evidence that the petitioner's parents were both alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed severe drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and he also bragged about cheating on her. His parents fought violently, and on at least one occasion, his mother stabbed his father. Rompilla was abused by his father who beat him with his hands, fists, leather straps, belts, and sticks when Rompilla was young. All of the children lived in terror. There were no expressions of parental love, affection, or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, and he slept in the attic with no heat. The children were not given clothes and attended school in rags. School records showed that Rompilla's IQ was in the mentally retarded range.

Compared with these cases, Swain's upbringing appears considerably less inhumane. He was not directly physically nor sexually abused, and there is no indication that he went without food or basic care. Swain was of at least average intelligence, and there is no indication that his parents, his stepparents or his grandparents treated him with either cruelty or indifference. While the trauma Swain suffered watching pornographic films with his uncle might be considered comparable to Wiggins' being subjected to his mother's engaging in sexual activity, and his experience in watching his father beat his mother was similar to Rompilla's experience, his overall upbringing appears significantly different from the horrific childhoods suffered by Wiggins, Taylor, and Rompilla.

In contrast, in *Land v. Allen*, 573 F.3d 1211, 1222–23 (11th Cir. 2009), the court found less than compelling that Land's biological father ignored Lamb and was abusive to his mother. The abuse, which sometimes occurred in front of Land, led to their divorce when he was one year old. Her subsequent marriage a few years later did not provide a loving father figure, as Land's stepfather did not treat him kindly. For example, at times his stepfather would take pictures of Land crying and then show them to him, saying "this is what you look like — a cry baby," and when Land's grandmother died, his stepfather told him he had fifteen minutes to cry in his room and then he had to "straighten up." Land was born with a club foot and eyes that were wide apart, and he was bullied extensively as an adolescent because he was shorter than his classmates. The court of appeals found that having divorced parents, being picked on at school, and losing a grandmother were unremarkable because they are things most people have to deal with while growing up. Land suffered from anti-social personality disorder, but no claim was made that he was of less than average intelligence.

Swain's social history appears similar to Land's. Although both defendants observed their stepfathers abuse their mothers and both had no contact with their biological fathers, they themselves suffered no direct abuse from their care givers and they were never forced to endure subhuman conditions. One distinction between the cases is that, unlike Land, Swain was not bullied at school. This distinction, however, weighs against finding that the difficulties in Swain's upbringing should be considered more compelling as mitigating evidence than Land's experience. The other distinction is that Land was not exposed to pornography at a young age, but Swain was. The Court finds, however, that this experience, while undeniably traumatic to Swain, would not have been a significant mitigating factor to jurors because Swain's crimes did not have a sexual component.

Indeed, his own expert witness, Allen, stated in her affidavit that "[c]ertainly, the oft-seen elements of sexual or violent predation are missing from his *modus operandi*." *See* Exhibit B to Petition for Writ of Habeas Corpus by a Person in State Custody, p. 10

> ### c.     Findings on Ineffective Assistance of Counsel Claim

The state court, noting that it had read accounts of truly horrific childhoods, found Swain's upbringing less than ideal, but not so atrocious that it would be likely to sway a jury. Swain's childhood is more similar to Land's childhood — which did not support a finding of prejudice — than to the childhoods of Wiggins, Taylor, and Rompilla — which did support a finding of prejudice. Thus, the state court was not unreasonable in finding that even had Swain presented the evidence of his upbringing and psychological problems, there was not a reasonable probability that at least one juror would have voted to spare his life. Accordingly, Swain has failed to show that the state court's decision was contrary to, or an unreasonable application of, the standards provided by clearly established federal law for succeeding on an ineffective assistance claim.

### C.     Jury Shuffle Violated Right to Equal Protection

Swain's final claim is that the prosecution's shuffling of the jury panel violated his right to the equal protection of the law. The state court found that this claim was defaulted because it had not been raised. The state court also denied the claim on its merits. Given that Swain has failed to establish either that he had good cause for failing to raise this claim or that a fundamental miscarriage of justice would occur if the Court declined to address the substance of the claim, the Court finds that this claim is barred from review under the doctrine of procedural default and that dismissal of Swain's third claim is appropriate. Accordingly, the Court dismisses Swain's final claim with prejudice.

## VI.  *Conclusion*

For the above reasons, the Court DISMISSES Swain's jury shuffle claim with prejudice.

Furthermore, the Court DENIES Swain's remaining claims: that his confession was improperly

admitted and that he received ineffective assistance of counsel. An Order and Judgment to this effect

will be entered.

**SIGNED this 31st day of March, 2010.**


MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE